No. 29,109.

JESS W. McCOY, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, *Appellant*.

(284 Pac. 417.)

Opinion filed February 8, 1930.

*William R. Smith, Owen J. Wood, Alfred A. Scott, Alfred G. Armstrong,*
all of Topeka, *E. S. McAnany, Maurice L. Alden* and *Thomas M. Van Cleave,*
all of Kansas City, for the appellant.

*Roy E. Smith* and *W. W. McCanles,* both of Kansas City, Mo., for the
appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.:   The Atchison, Topeka & Santa Fe Railway

Company appeals from a judgment awarding the plaintiff, Jess W. McCoy, damages in the sum of $15,500. The plaintiff, a carpenter, with six or seven other employees of defendant, were engaged in repairing a foot viaduct over defendant's railway tracks under the supervision of a foreman. The viaduct is a wooden structure about 800 feet long and supported by wooden posts, which made the floor of the viaduct about 22 feet from the ground. Some of the timbers in the viaduct had become rotten and the nails rusted, weak and broken. The spaces between the posts supporting the viaduct are called spans and the supporting posts are called bents. There is an upper chord and a lower chord. The chords extend from one bent to the other and are timbers six by nine inches in diameter, and the spans vary in length from about thirty to thirty-six feet. In repairing the viaduct it became necessary to replace a lower chord, and to do so the railing over the chord had to be removed. A new lower chord had been put in place between two bents. Before the plaintiff's injury, he was working on a bent where the new lower chord had just been put in. On top of the posts constituting the bent is a timber six by eight inches in diameter, about nine feet long, called a cap. This cap extends on the outside of each supporting post about two feet. When the railing on the side of the viaduct is in place it is supported by a brace running from the top chord to the end of a cap. The brace is a timber four by six inches in diameter and from five to six feet in length, extending diagonally from the top chord to the lower one. It is tapered at the top and is toenailed at the bottom to the cap, and the top of the brace is nailed to the top chord. The plaintiff stated that on the morning of his injury they had taken out some of the timbers, loosened some of the braces and took the pins out of the bottom chord. It was the function of the foreman to test the condition of the braces and timbers of the viaduct and determine which were sound and which were defective and would have to be replaced by new ones. On the morning of the accident the plaintiff had been at work at one of the bents where a new lower chord was being put in, and had supported himself by holding on to the brace which had not then been loosened. He was directed to go to the end of the viaduct and bring a new post for the north end of the span. Plaintiff said that at that time he asked the foreman if he wanted a new post for the south end of the span, and that the foreman said, "We are not going to make repairs on that end." While plaintiff was away to get the post, the foreman inspected the other end of the span by prying loose the

top of the brace so that it stood out several inches, but it was still nailed at the bottom. When plaintiff returned with the post he began boring a hole through the lower chord for a bolt, close to the brace which had been pried loose for inspection, and as he leaned over to clear away shavings and borings, he took hold of the brace, which gave way, and he fell to the ground and was severely injured. The jury returned a verdict in favor of the plaintiff and with it the following answers to special questions submitted by the court:

"1. When was the brace, which fell to the ground at the time the plaintiff fell and was injured, loosened at its upper end? A. While the plaintiff was away from the scene, about 9:15 a. m.

"2. What was the purpose of loosening the upper end of the brace? A. To investigate its conditions.

"3. Was there anything to prevent the plaintiff from seeing that the brace, which fell to the ground when plaintiff fell, had been pulled loose at its upper end two or more inches so that the nails in it no longer fastened it to the upper chord? A. No.

"4. If you answer the next preceding question 'Yes,' state what prevented plaintiff from seeing that the brace was loose at its upper end. A. (No answer.)

"5. Could plaintiff have discovered that the upper end of the brace was loose if he had looked at it? A. Yes.

"6. If you answer the next preceding question 'No,' state why he could not have discovered its condition. A. (No answer.)

"7. Was the defendant, at the time the plaintiff was injured, considering the nature of the work in which plaintiff was engaged, giving the plaintiff as safe a place to work as was reasonably possible? A. No.

"8. If you answer the foregoing question 'No,' state what the defendant could and should have done under the circumstances to have made the place where plaintiff was working reasonably safe. A. The brace should have been removed entirely or the men should have been told of its condition.

"9. If you find for the plaintiff, state the amount, if any, of special damages you find the plaintiff sustained because of inability to work at his trade. A. $19,720.

"10. If you find for the plaintiff, state what amount of general damages you find he sustained. A. $3,500.

"11. Was the plaintiff negligent to some extent in causing himself to fall? A. Yes.

"12. If you find plaintiff's negligence contributed to his injury, state what amount you deduct from his general and special damages because of such contributory negligence. A. $7,740.

"13. If you find a verdict for the plaintiff, state the exact negligence of the defendant upon which you base your verdict. A. Failure to remove the brace entirely or to warn the men of its condition.

"14. Had the plaintiff been hanging to the brace in question while he was taking out a bolt from the chord shortly before he fell? A. Yes.

"15. Was the brace removed from the top chord and loosened after plaintiff had been hanging to same shortly before? A. Yes.

"16. Did the plaintiff know that said brace had been loosened at the top when he took hold of same? A. No.

"17. Did the defendant's foreman Sullivan tell the plaintiff that he did not intend to make any repairs at the south end of the span where plaintiff fell? A. Yes.

"18. Did the defendant's foreman Sullivan warn the plaintiff that said brace had been removed or loosened at the top of said chord before plaintiff fell? A. No.

"19. Was plaintiff away at the time said brace was loosened? A. Yes."

The defendant assigns as error the overruling of its demurrer to the evidence of plaintiff, the overruling of defendant's motion made at the conclusion of the evidence to instruct the jury to return a verdict for defendant, its motion for judgment on the special findings, and also one asking a new trial.

It is insisted that, taking the facts as stated by plaintiff, there is no ground for a recovery. The nature of the work was the making of an unsafe place safe, that it was one of continual change in loosening of braces and other timbers in order to discover defects or weakness and to provide for the substitution of new and sound ones, and that this was known to the plaintiff and other workmen. Besides, it is said that the fact that the brace had been loosened was open to casual observation and that as the work in which plaintiff was engaged created constant changes and dangers as it progressed, the plaintiff necessarily assumed the risk incident to it.

Plaintiff concedes that where a dangerous place is being made safe or an unsafe place repaired, the duty devolves on the workman to care for his own safety, and that he assumes the risk unless the master negligently increases the peril. The contention is that the brace was firm and safe twenty minutes before the accident and that the statement of the foreman that no repairs were to be made on the other bent was sufficient assurance to plaintiff that the brace would not be loosened in his absence, and that it was unnecessary for him to observe its condition to see whether he could safely lean his weight upon it when he returned to work upon the viaduct. In these circumstances it is urged that the master should have warned him of the change or loosening of the brace. While it is the duty of the master to furnish a reasonably safe place to work, there is a well-established exception to the rule where the work is of such a character that in its progress there are constant changes creating dangers, as in the construction or repairs of buildings which in their

nature is the making of an unsafe place safe. In that situation the workman assumes the risk. On this question it has been held that:

"The duty of an employer to provide a safe place for his employee to work does not extend to a place made dangerous by the very work being done. This principle applies to repairs or improvements which in their ordinary progress lead to dangers readily to be foreseen and appreciated by the workman." (*West v. Packing Co.*, 86 Kan. 890, 122 Pac. 1024.)

In a case where a miner had placed shots to be exploded in order to loosen coal, and the shots were fired which loosened the coal and knocked down props which supported the roof of the mine, the shots were fired by another man under the direction of the operator. When the miner entered the room after the shots had been fired he undertook to replace the props, and while doing so the roof which had been damaged by the explosion fell and injured him. It was held that in the situation it was incumbent on the miner to inspect the roof when he returned to work. It was said that:

"The rule that an employer must furnish an employee a reasonably safe place in which to work does not apply where the employee furnishes his own place, or where the place is continually changing by reason of the work itself. As the plaintiff removed the coal from his room he made a place in which he would work after that coal was removed. He was continually changing the place by reason of the work he was doing." (*Brooks v. Coal & Coke Co.*, 96 Kan. 530, 532, 152 Pac. 616.)

See, also, *Henderson v. Gypsum Co.*, 84 Kan. 336, 114 Pac. 233; 39 C. J. 912, 913.

The plaintiff, who had been engaged in work on the viaduct, was familiar with the character of the work and knew that it consisted principally of the removal and repair of parts of the viaduct, that search for defects was constant and changes of conditions were continuous. The remark of the foreman to plaintiff that a second post was not required and that no repairs were to be made on the other bent that required a post, did not warrant plaintiff in assuming that conditions would not be changed while he went after the post. Change was the order of the day as well as the nature of the work. Plaintiff said that the workmen tested the braces by prying them loose to see whether the nails were so rusted as to be unsafe. That they jabbed the wood with a pointed bar to see if it was solid or rotten. If found to be rotten they were taken out and if solid they were renailed, and this was done right along from span to span as the work proceeded from the north to the south. Under the circumstances plaintiff could not assume that

work of other employees would cease when he went after a post or that conditions would not be changed in his absence. The danger from the loosened brace was not a hidden one, but was an open and obvious one which plaintiff could have seen at a glance. Dangers of this kind to which plaintiff and other workmen were exposed were continuous and encountered at almost every step in the process. They could not expect and did not wait for men to follow them around to warn them that changes were being made. The making of changes was the work which they were doing. Under the authorities it must be held that plaintiff assumed the risk which he encountered and that the injury sustained cannot be regarded as the result of defendant's negligence.

The demurrer to plaintiff's evidence should have been sustained and its motion for judgment upheld. The judgment is therefore reversed and the cause remanded with the direction to enter judgment for defendant.